UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDAN G. DUNLEAVY,

    Plaintiff,

vs.

WAYNE COUNTY COMMISSION, et al.,

    Defendants.
_____/

Civil Action No.
04-CV-74670-DT

HON. BERNARD A. FRIEDMAN

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter is presently before the court on two defense motions for summary judgment [docket entries 20 and 21]. The motions have been fully briefed and the court has heard oral argument. For the reasons stated below, the court shall grant the motions in part and deny them in part.

### Introduction

This is essentially a whistleblower and First Amendment case. The plaintiff is Brendan Dunleavy, who served for 13 years as an auditor for Wayne County. From 1991 to 1997 he served as the Assistant Auditor General, and from 1997 to September 2004 he served as the Wayne County Auditor General. In September 2004 his appointment expired and was not renewed. Plaintiff could have been reappointed for at most three more years, as a county ordinance limits the holder of this political position to a maximum of ten years. Plaintiff applied for reappointment, but another candidate was selected instead.

The main thrust of plaintiff's complaint is that defendants decided not to renew his term in retaliation for the fact that plaintiff was successful in ferreting out political corruption and other wrongdoing within the county, which was highly embarrassing to county officials, city officials, and politically connected individuals and corporations. At pages 9-15 of the complaint,[1] plaintiff presents a detailed chart listing his many investigations and audit findings, the persons involved, and the "protected activity" (i.e., plaintiff's allegedly protected First Amendment activity) connected with each item. This chart covers a wide range of subjects, including such things as irregularities in contracts and other financial matters relating to operations at Detroit Metropolitan Airport (e.g., parking, signage, and construction contracts); nepotism; mismanaged, no-bid, and expired contracts for various goods and services; improper small business contracts; irregularities in county building leases; mismanagement and other wrongdoing regarding county health care and juvenile/family programs; misuse and misappropriation of county funds; and manipulation of county financial statements. Plaintiff also alleges that he was a confidential informant who provided the FBI with information about possible criminal activity he uncovered in the course of these investigations.

Plaintiff alleges that in December 2002, approximately one year and nine months before his term was to expire, the county's Audit Committee, consisting of five commissioners, with the concurrence of the Government Committee, consisting of four commissioners, approved a three-year extension to plaintiff's appointment, which would have extended plaintiff's term to the full,

---

[1] The references in this opinion to allegations in the complaint refer to the original complaint. Plaintiff filed an amended complaint after defendants filed the summary judgment motions at issue in this opinion. The allegations in the original and amended complaints are substantively the same, except as regards plaintiff's RICO claim which the court will address at a hearing scheduled for May 3, 2006.

allowable ten years. However, Jewel Ware, the commission chairperson, allegedly would not place the proposed extension on the agenda of the Committee of the Whole. When plaintiff's term expired, he applied for the position but the Audit Committee voted to recommend another candidate, Willie Mayo, and the full commission voted unanimously to follow that recommendation. Plaintiff also alleges that Ware, "acting in her individual and official capacity as Personnel Director for WCC, terminated Dunleavy's active employment but could not legally remove him from his appointed office." Complaint ¶ 20. Apparently plaintiff's term ended on Friday, September 17, 2004. Plaintiff returned to work the following week as, in his words, a "hold-over appointee" until his replacement was appointed. On Tuesday, September 21, 2004, defendant Ware instructed plaintiff to leave. However, it is undisputed that plaintiff continued to receive his full salary and benefits until his replacement was appointed by the commission on December 1, 2004.

Plaintiff alleges that during his tenure as Auditor General he "frequently exercised his First Amendment right to speak publicly about matters of public concern or reported to various public bodies and law enforcement agencies actual or suspected violations of law committed by Wayne County employees or third-parties associated with Wayne County or participated in various public-body or law enforcement agency hearings or investigations." Complaint ¶ 25. Defendant Ware allegedly disliked plaintiff and complained to others about him because he talked too much to the press and because he was "too close" to the FBI. As a result of his investigative efforts, and talking about his findings with the press and the FBI, plaintiff claims Ware entered into a campaign to remove him from office. She allegedly recruited another commissioner, defendant Bernard Parker, to head a search committee to find plaintiff's replacement and that Parker, in turn, "threatened at least one commissioner that reelection support would be withheld unless that

3

commissioner agreed to vote against the extension of Dunleavy's contract." Complaint ¶ 29.

The defendants in this case are Wayne County Commission ("WCC"), Wayne County, Jewel Ware, Bernard Parker, and the county's chief financial officer, Bella Marshall.

The complaint asserts seven claims. Count I, "Retaliation for Exercising First Amendment Rights – Discharge and Failure to Reappoint," is asserted against defendants Ware, Parker, and WCC. In this claim, plaintiff alleges that he spoke out on many matters of public concern, all relating to fraud, corruption, and mismanagement within county government. Ware and Parker allegedly retaliated against plaintiff and agreed "to terminate Dunleavy's employment in order to silence him and prevent him from continuing investigations which might cause [them] personal liability and/or political embarrassment." Complaint ¶ 36. The commission allegedly "ratified" Ware's and Parker's retaliatory conduct "when it failed to reappoint Dunleavy to the position of Auditor General for the completion of his ten-year term." *Id.* ¶ 37. The other commissioners allegedly "were fully aware that Ware and Parker took action against Dunleavy because of Dunleavy's protected activities . . . and because of Ware and Parker's desire to silence Dunleavy." *Id.* ¶ 38.

Count II asserts a RICO claim against Ware and Parker. The complaint identifies WCC as a RICO enterprise and various predicate acts. The court shall not analyze the RICO claim here, as it has been amended and will be addressed at the May 3, 2006, hearing. *See* n.1, *supra.*

In Count III, plaintiff asserts a claim under the Michigan Whistleblower Protection Act against WCC and Wayne County. He alleges that WCC terminated him because he "reported or was about to report a violation of or suspected violation of a federal or state statute or regulation to a public body" or because he "participated in an investigation conducted by a public body."

4

Complaint ¶ 50. Dunleavy alleges he reported violations, or suspected violations, to the county prosecutor's office, the Michigan Auditor General's Office, the FBI, the Justice Department, and other county officials.

In Count IV, plaintiff asserts a claim against WCC and Wayne County for "discharge in violation of public policy." This claim is based on the same allegations as Count III.

Count V is a claim against WCC and Wayne County for wrongful discharge. Plaintiff alleges that this "termination of active employment by defendant Ware, occurring on September 21, 2004, occurred without the requisite action from the WCC . . ." Complaint ¶ 65.

In Count VI, plaintiff asserts a claim against WCC and Wayne County for violation of his Fourteenth Amendment due process rights. Plaintiff alleges he had a property interest in his Auditor General position, and that he could not be removed without due process.

Finally, in Count VII, plaintiff asserts a claim against defendant Marshall for tortious interference with contractual or advantageous business relationships. Plaintiff alleges that Marshall "falsely accus[ed] Dunleavy of being a 'racist' or [made] other false and malicious statements regarding Dunleavy for the sole purpose of manufacturing reasons which would justify Dunleavy's termination from active employment." Complaint ¶ 76. Plaintiff also alleges that Marshall spread rumors that plaintiff wanted to fire African-American CPA's. The complaint alleges that Marshall's "improper interference . . . was a major contributing cause to the termination from active employment as Wayne County Auditor and the decision by the WCC not to reappoint him." Complaint ¶ 78.

**Defendants' Motion for Summary Judgment**

      **A. Legislative Immunity**

Defendants Ware and Parker argue that all of plaintiff's claims are barred as to them because, as county commissioners, they are entitled to absolute legislative immunity. They cite *Bogan v. Scott-Harris*, 118 S. Ct. 966 (1998), for the general proposition that legislators at all levels of government are entitled to immunity for "legislative activities." Defendants also suggest that under *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), they are entitled to qualified immunity because plaintiff does not allege that they violated any of his clearly established rights.

The court rejects these arguments. Plaintiff correctly notes that legislative immunity does not apply when legislators make individual employment decisions. *See Canary v. Osborn*, 211 F.3d 324 (6th Cir. 2000); *Smith v. Lomax*, 45 F.3d 402 (11th Cir. 1995). In *Canary*, the court distinguished between "personalized assessments of individual employees," which is not legislative in nature, and "impersonal budgetary analysis of various positions," which is. 211 F.3d at 330. On this authority, it is apparent that the defendants in the present case are not entitled to legislative immunity.

Nor are defendants entitled to qualified immunity, as the right at issue in this case – namely, the First Amendment right to speak freely on matters of public concern without being retaliated against – is clearly established, as noted in the following section.

      **B. First Amendment (Count I)**

As to this claim, defendants first argue that their problem with Dunleavy was not the

content of his speech but the fact that he would release information to the press before the commissioners themselves heard about it. Significantly, defendants offer no evidence in support of this argument except one page of deposition testimony from "Lyn Bankes," who defendants do not identify. Plaintiff denies that there was ever anything improper about the "timing" of the release of his audits. He contends that his audit reports were always filed with the county clerk's office, and at that he had no control over whether the press or the commissions obtained copies first. In any event, this clearly is a disputed issue of fact. Further, plaintiff argues that defendants' motion is premature because discovery is incomplete.

Defendants next argue that plaintiff had no free speech rights as the Auditor General because this is considered a "confidential or policymaking" public position. The court rejects this argument. Defendants cite *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996), in which an Ohio county auditor fired several employees in his office, who then sued him on the grounds that they had a First Amendment right to be free of patronage dismissals. The issue in the case was whether plaintiffs were entitled to First Amendment protection, since previous case law established it is permissible for a public employer to discharge employees based on their party affiliation if "party affiliation is an appropriate requirement for the effective performance of that office." *Id.* at 1547, *citing Branti v. Finkel*, 445 U.S. 507 (1980). The issue in such cases is whether the plaintiff-employee held a policymaking or confidential position. If so, then the plaintiff-employee's First Amendment right to freedom of association is not violated when he is discharged for belonging to a party other than the one currently in office, since party affiliation is a legitimate job qualification.

In *McCloud* the Sixth Circuit identified four categories of policymaking or confidential positions which are not protected from patronage dismissal. Category One covers

7

positions created by statute or ordinance, with discretionary authority to enforce the law or carry out "some other policy of political concern." Category Two covers positions to which authority has been delegated from a Category One position. Category Three covers confidential advisors. Category Four covers positions "filled by balancing out political party representation." *Id.* at 1557.

In the present case, defendants argue that plaintiff "served in a Category One position of confidentiality and policy making. As such, his speech was not protected and his First Amendment retaliatory discharge claim fails as a matter of law." This argument misapplies *McCloud*. The point of the *McCloud* and *Branti* line of cases is that certain categories of confidential and policymaking employees do not have First Amendment protection because they are expected to carry out certain political policies or agendas. The Sixth Circuit made this clear in explaining what it meant by "category one" positions:

> Category one captures the intuition gained from reading *Elrod, Branti,* and *Rutan* that a chief executive's cabinet secretaries and similar employees fall into the *Branti* exception. The proviso that the policymaking authority possessed by a category one position-holder must be held in relation to a matter of political concern stems from the discussion in *Branti* that a football coach is a policymaker, *but not the sort of policymaker for whom political affiliation is an appropriate requirement under the First Amendment.*

97 F.3d at 1557 n.30 (emphasis added). *See also Branti v. Finkel*, 445 U.S. 507, 518 (1980) ("the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved"); *Elrod v. Burns*, 427 U.S. 347, 367 (1976) (stating that politically loyal employees are necessary "to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, polities presumably sanctioned by the electorate"). In the present case,

8

political affiliation and loyalty to the administration clearly are not "appropriate requirements" of plaintiff's position. To the contrary, the very essence of the position is its independence from any influence from political parties or county administration.

Defendants do cite one case, *Rose v. Stephens*, 291 F.3d 917 (6th Cir. 2002), which suggests that *McCloud* applies not only when party affiliation is an appropriate job requirement but whenever "loyalty" to the hiring authority is required. In *Rose*, plaintiff was the Kentucky state police commissioner who was discharged after sending a memo to the governor and the Justice Cabinet Secretary criticizing the performance of the deputy police commissioner and stating plaintiff's intention to abolish that position. The court determined that plaintiff held a "category one" position and that he therefore had no First Amendment right to speak on "job-related issues in a manner contrary to the position of his employer." *Id.* at 923. Elsewhere in the opinion, the court went so far as to suggest that plaintiff had no First Amendment protection because the memo addressed issues "clearly related to police department policies." *Id.* at 925.

The court does not believe *Rose* can be understood as standing for the blanket proposition that a "Category One" employee has no First Amendment right to speak on "job-related issues." Throughout the opinion, the court mentions that this exception to First Amendment rights is based on the government's need for "loyal" workers who will carry out the government's policies. "This rule flows logically from the Supreme Court's recognition in the political patronage cases that the government has a legitimate interest in securing employees who will loyally implement its policies." *Id.* at 922. "When such an employee speaks in a manner that undermines the trust and confidence that are central to his position, the balance definitively tips in the government's favor because an overt act of disloyalty necessarily causes significant disruption in the working

relationship between a confidential employee and his superiors." *Id.* at 923. In the present case, there is no question about plaintiff's "loyalty." In fact, he is not supposed to be "loyal" to a particular party or to "loyally implement" government policies. Rather, he is supposed to ferret out corruption and wrongdoing which, according to plaintiff, was being perpetrated by, or for the benefit of, the government itself.

Generally, when a public employee alleges he was discharged in retaliation for exercising First Amendment rights, the threshold issue is whether the employee's speech relates to a "matter of public concern." *Connick v. Myers*, 461 U.S. 138 (1983). Defendants appear to concede that Dunleavy's speech qualifies. The next step is to engage in "the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563 (1968), to determine if the employee's free speech interests outweigh the efficiency interests of the government as an employer." *Rose*, 291 F.3d at 920. The significance of the *Branti/McCloud/Rose* line of cases is that if the employee falls into one of the categories of confidential or policymaking positions, then the *Pickering* balancing test is not necessary because the balance tips in the government's favor automatically. However, for the reasons stated above, the court is not persuaded that plaintiff's position as auditor general actually falls into those categories, since neither party affiliation nor "loyalty" of the sort at issue in those cases plays any role. Therefore, the burden is on the defendants under *Pickering* to demonstrate that plaintiff's speech was disruptive of efficient government operations.

For these reason, the court shall deny defendants' motion as to the First Amendment claim. Additionally, further discovery is needed in order to delve into the reason(s) why plaintiff's appointment was not renewed.

### C. Whistleblower Claim (Count III)

Defendants argue that the whistleblower claim fails because plaintiff lacks evidence of causation. The court cannot grant summary judgment on this basis at this time, as discovery is incomplete.

Defendants also argue that "Michigan courts have carved out an exception for a plaintiff whose alleged protected activities are part of their job function." Defendant's Brief, p. 21. They argue that since plaintiff was supposed to report actual or suspected crime or other wrongdoing, he has no protection under the whistleblower statute.

Michigan's whistleblower statute prohibits an employer from discharging, threatening or otherwise discriminating against an employee

> because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. § 15.362.

For the claimed exception applicable to employees who report violations as part of their job duties, defendants first cite *Deneau v. Manor Care, Inc.*, 219 F.Supp.2d 855 (E.D. Mich. 2002). The plaintiff in that case was a nursing home employee who alleged she was discharged because she submitted data to the State of Michigan indicating that the patients were losing weight. The court concluded that since one of plaintiff's job duties was to report the data in question, she was not the initiator of the report; rather, plaintiff was defendant's agent and so actually defendant itself was the initiator. Clearly, the facts in the present case are much different, as Dunleavy did

11

much more than simply prepare his audits and file them with the county clerk's office, in accordance with his job duties. Plaintiff alleges that he also reported suspected criminal activity to the county prosecutor's office, as well as state and federal authorities. *Deneau* is inapplicable.

Defendants next cite *Biggs v. City of Taylor*, 2004 WL 817182 (Mich. App. April 15, 2004). In that case, the court dismissed a whistleblower claim where plaintiff, a police officer, was discharged after writing a traffic ticket but then voiding it after he learned that the offender was the mother of a superior officer. Defendants quote the court's statement that "plaintiff's activity of issuing and then voiding a traffic ticket as part of the normal course of his employment as a police officer is not protected activity under the WPA. Plaintiff was simply performing his ordinary duties as a police officer . . ." *Id.* at *2. However, the court went on to explain that "plaintiff's writing a traffic violation to a single individual was in no way an attempt to combat corruption or criminally irresponsible behavior of a government or business entity." *Id.* Again, the facts of our case are completely different.

Defendants also cite *Flores v. Atofina Chems., Inc.*, No. 249988 (Mich. App. Jan. 11, 2005), in which the court stated that "reporting to an employer or reporting to a public body pursuant to an employer's policy is not protected activity." However, that case was decided based on plaintiff's failure to prove causation, not because he was acting in accordance with his employer's policy. Plaintiff, a chemical plant manager, was discharged after he closed the plant because he smelled an odor he believed was caused by a dangerous chemical leak. Plaintiff did file a police report about the incident, but he failed to prove that his supervisors knew about it or acted on it.

Defendants have not demonstrated their entitlement to summary judgment on the grounds that the whistleblower statute does not apply to plaintiff because he was "simply doing his

12

job" as an auditor. It would be ironic indeed if an employee such as Dunleavy, who was specifically charged with ferreting out crime, corruption and other wrongdoing, would have no protection under the whistleblower statute for reporting such findings to authorities.

### D. Discharge in Violation of Michigan Public Policy (Count IV)

Defendants next seek summary judgment on plaintiff's claim that he was discharged in violation of Michigan public policy. The court shall grant defendants' motion as to this claim because, as plaintiff acknowledges, his whistleblower claim is his exclusive remedy for retaliatory discharge. *See Dudewicz v. Norris Schmid, Inc.*, 443 Mich. 68, 79-80 (1993).

### E. Wrongful Discharge (Count V)

In this claim, plaintiff argues that when his term expired he became a "holdover," and that under a county ordinance he could be removed from office only by a two-thirds vote of the commissioners. Since no such vote took place, plaintiff concludes that he was wrongfully discharged.

The quoted section of the county ordinance obviously means that if an auditor general is to be removed during his term, a two-thirds vote is required. If the term simply expires, there is no need for such a vote. In the present case, plaintiff's term expired and another candidate was appointed in his place. The ordinance has no application and the claim has no merit. The court shall grant defendants' motion as to this claim.

### F. Fourteenth Amendment, Due Process Claim (Count VI)

Defendants seek summary judgment as to this claim because plaintiff had no property interest in his job as auditor general. The term expired and he had no legitimate expectation that it would be renewed. There being no property interest, there was no deprivation and therefore no entitlement to due process. Further, plaintiff continued to receive his salary until December 1, 2004, when his successor was appointed. Defendants cite *James v. City of Burton*, 221 Mich. 130 (1997), for the proposition that there is no job security, and therefore no property rights, in continued employment where the job is a political appointment.

Plaintiff's only response to this argument is to repeat that he "immediately became a holdover at the expiration of his term." Plaintiff's Response, p. 35. Plaintiff cites no supporting Michigan case authority. He points again to the county ordinance stating that the auditor general "may be removed for cause by a two-thirds vote of the commissioners serving." As noted above, this claim has no merit. Therefore, the court shall grant summary judgment for defendants as to this count.

### G. Tortious Interference (Count VII)

This claim is directed only at defendant Bella Marshall, who was the county's chief financial officer during the time frame relevant to this case. Marshall allegedly spread rumors about plaintiff being a racist and lobbied commissioners not to renew his appointment, allegedly because plaintiff was in the process of auditing the county's financial reports, which contained many irregularities.

The elements of this claim are:

14

> (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach of termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Mich. Podiatric Med. Ass'n v. Nat'l Foot Care Program, Inc.*, 175 Mich. App. 723, 735 (1989). Plaintiff must show that the expectancy is "a reasonable likelihood or probability, not mere wishful thinking." *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377 (1984).

Defendant first argues that plaintiff's only evidence of interference is hearsay. At his deposition, plaintiff admitted he had no personal knowledge that Marshall had spoken poorly of him during conversations with commissioners. Plaintiff testified that he had heard from others (Lyn Bankes and Bill Johnson) that Marshall had these conversations. Plaintiff states that he needs more discovery, particularly from Marshall herself, who has not been deposed. The court is satisfied that plaintiff should be permitted to engage in full discovery before this claim can be decided.

Defendant Marshall next argues that the claim fails because she is not a "third party" to the relationship between Dunleavy and the county, since she herself is an agent of the county. The court disagrees. Dunleavy notes that he was hired by the commission and could be removed only by the commission, whereas Marshall worked for the county.

Defendant also argues that plaintiff had no reasonable expectation that his contract would be renewed, and so the first element of the claim cannot be established. This is a disputed issue of fact. Plaintiff alleges that in February 2004, he informally lobbied the commissioners and found that he had enough support to be reappointed. Plaintiff contends it was not until after defendants engaged in their smear campaign that he lost this support. The court shall permit

additional discovery on these issues.

**Defendants' Motion for Partial Summary Judgment on the RICO Claim (Count II)**

Defendants have filed a separate motion for partial summary judgment as to plaintiff's RICO claim. At the hearing on the summary judgment motions, the court indicated that it would permit plaintiff to amend his complaint in order to correct certain pleading errors relating to this claim. Plaintiff has amended his complaint and defendants have filed a summary judgment motion that is directed at the amended allegations. That motion is scheduled to be heard on May 3, 2006. Accordingly, the instant motion shall be denied without prejudice.

**Conclusion**

For the reasons stated above,

IT IS ORDERED that defendants' motion for summary judgment [docket entry 20] is granted in part and denied in part as follows: The motion is denied as to Count I (First Amendment), Count III (Whistleblower), and Count VII (Tortious Interference), but granted as to Count IV (Violation of Michigan Public Policy), Count V (Wrongful Discharge), and Count VI (Fourteenth Amendment).

IT IS FURTHER ORDERED that defendants' motion for partial summary judgment [docket entry 21] is denied without prejudice.

\_\_\_s/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
CHIEF UNITED STATES DISTRICT JUDGE

Dated:    March 30, 2006
         Detroit, Michigan

**I hereby certify that a copy of the foregoing document was served this date upon counsel of record electronically and/or via first-class mail.**

**_____/s/ Patricia Foster Hommel_____
Patricia Foster Hommel
Secretary to Chief Judge Friedman**

17