UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENDAN G. DUNLEAVY,

      Plaintiff,                                      Civil Action No.
                                                     04-CV-74670-DT

vs.

                                                    HON. BERNARD A. FRIEDMAN

WAYNE COUNTY COMMISSION, et al.,

      Defendants.
_____/

## OPINION AND ORDER OF DISMISSAL

        This matter is presently before the court on the court's order of June 14, 2006, requiring plaintiff to show cause why his First Amendment claim should not be dismissed. Plaintiff has responded to the court's show cause order and defendants have replied. As the court does not believe oral argument is necessary, it shall decide the issue on the briefs.

        Plaintiff Brendan Dunleavy served for 13 years as an auditor for Wayne County. From 1991 to 1997, he served as the Assistant Auditor General, and from 1997 to September 2004 he served as the Wayne County Auditor General. In September 2004, his appointment expired and was not renewed. Plaintiff could have been reappointed as Auditor General for at most three more years, as a county ordinance limits the holder of this political position to a maximum of ten years. Plaintiff applied for reappointment, but the county commission selected another candidate instead.

        The main thrust of plaintiff's complaint is that defendants decided not to renew his term in retaliation for the fact that plaintiff was successful in ferreting out political corruption and other wrongdoing within the county, which was embarrassing to county officials, city officials, and politically connected individuals and corporations. Plaintiff also alleges that he was a confidential

FBI informant and that he provided the FBI and other law enforcement agencies with information about possible criminal activity he uncovered in the course of these investigations.

Plaintiff alleges that during his tenure as Auditor General he "frequently exercised his First-Amendment right to speak publicly about matters of public concern, reported to various public bodies and law enforcement agencies actual or suspected violations of law committed by Wayne County employees or third-parties associated with Wayne County, and participated in various public-body or law enforcement agency hearings or investigations." Amended Complaint ¶ 17. As a result of his vigorous investigative efforts, and because he spoke to the press and the FBI about his findings, plaintiff alleges that defendant Ware entered into a campaign to prevent him from being reappointed. Ware allegedly recruited defendant Parker to head a search committee to find plaintiff's replacement. Parker allegedly was likewise critical of plaintiff's "press conferences." *Id.* ¶ 69. Eventually the county commission voted to appoint the candidate recommended by the search committee, Willie Mayo.

Of the eight counts of the amended complaint, four are based on federal law and four on Michigan law.[1] Of the four counts containing federal claims, only Count I (First Amendment) remains.[2] This claim is based on the allegation that "[d]efendants Ware and Parker retaliated against

---

[1] Count I alleges a violation of plaintiff's First Amendment rights. Counts II and III assert civil RICO claims. Count IV alleges a violation of the Michigan whistleblower's statute. Count V alleges that defendants' actions violated Michigan public policy. Count VI asserts a claim for wrongful discharge. Count VII alleges that defendants violated plaintiff's Fourteenth Amendment due process rights. And Count VIII alleges tortious interference with contractual or advantageous business relationships.

[2] On March 30, 2006, the court granted summary judgment for defendants on plaintiff's due process claim [docket entry 51]; and on May 11, 2006, the court dismissed plaintiff's civil RICO claims [docket entry 55]. The court has also dismissed plaintiff's public policy and wrongful discharge claims.

2

Dunleavy because he exercised his right to speak out on the above-described matters of public concern or engage in these protected activities." *Id.* ¶ 81.  The speech and activities allegedly included:

- Speaking out about fraud and corruption in the awarding of contracts for the providing of goods and services to Wayne County.

- Speaking out about fraud and corruption in the payment of contracts for goods and services provided to Wayne County.

- Speaking out about fraud and corruption in the administration of contracts for the provision of goods and services to Wayne County.

- Speaking out about gross mismanagement of Wayne County programs, departments, divisions and other activities, resulting in the loss of government funds through corruption, embezzlement, indifference or incompetency.

- Speaking out about violations of the county's ethics, conflict-of-interest standards and related party transaction rules.

- Investigating the conduct of public officials and closely associated persons and organizations.

- Providing information to law enforcement agencies about actual or suspected criminal conduct of public officials.

*Id.* ¶ 80.  Defendant Wayne County Commission allegedly ratified Ware's and Parker's retaliatory conduct by declining to reappoint him.  *See id.* ¶ 84.

The court issued its show cause order because the viability of plaintiff's First Amendment claim appeared to be severely undercut by a recent United States Supreme Court decision, *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006).  *Garcetti* examined whether the First Amendment protects a government employee from discipline stemming from speech made by the employee pursuant to the employee's official duties.

In *Garcetti*, Richard Ceballos, who was employed as a deputy district attorney,

3

learned that an affidavit used by the government to obtain a search warrant may have contained inaccuracies. He investigated the matter, determined that the affidavit did indeed contain misrepresentations, prepared a memo to this effect, and recommended that the case be dismissed. Ceballos' superiors disregarded this recommendation and decided to continue with the prosecution. At a hearing on a defense motion challenging the lawfulness of the warrant, Ceballos testified as a witness regarding the details of his investigation.

Ceballos alleged that he was later subjected to retaliatory employment actions including reassignment, transfer to another courthouse, and denial of a promotion. He claimed that this mistreatment amounted to retaliation for his memo, which he believed constituted speech protected by the First Amendment. The Supreme Court rejected this claim, stating:

> We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.
>
> \* \* \*
>
> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.
>
> \* \* \*
>
> Proper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities. Because Ceballos' memo falls into this category, his allegation of unconstitutional retaliation must fail.

*Id.* at 1960-61.

The Court indicated that public employers may not restrict all speech by public employees at their workplaces or all speech relating to the subject matter of their employment. *See*

4

*id.* at 1959. However, when public employees make statements *pursuant to their official duties*, First Amendment protection is lost.[3] The First Amendment protects speech by "a *citizen* on a matter of public concern." *Id.* at 1958, *citing Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (emphasis added). A public employee who speaks pursuant to official responsibilities does not speak in this capacity, even if the subject matter of the speech otherwise is of public concern.

Applying these principles to the facts of *Garcetti*, the Court held that Ceballos wrote the memo in question "because that is part of what he, as calendar deputy, was employed to do." *Id.* at 1960. In this context, Ceballos was therefore not speaking "as a citizen," *id.*, and his speech was not protected by the First Amendment.

In his response to the court's show cause order, plaintiff attempts to distinguish *Garcetti* by arguing that his speech to the media and law enforcement relating to suspected and actual government misconduct was not made pursuant to his duties as auditor. Plaintiff contends that he spoke to the media and law enforcement not as a government employee but rather as a concerned citizen. Defendants argue that plaintiff was indeed acting pursuant to his official job duties when he communicated with the media and law enforcement and that the instant case is indistinguishable from *Garcetti*.

Plaintiff states that in interacting with the media, "[he] was not performing his official audit functions," but instead was "simply providing clarification to aid the public discourse about

---

[3]This is not to say that public employees have no remedy when their employers discipline them for speaking about actual or suspected criminal conduct discovered in the course of their employment. In *Garcetti*, the Supreme Court made a point of noting that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance" and that a "powerful network of legislative enactments – such as whistleblower protection laws and labor codes – [are] available to those who seek to expose wrongdoing." *Id.* at 1962. In the present case, plaintiff has asserted a claim under Michigan's whistleblower protection statute, and he is free to pursue that claim in the appropriate forum.

5

important public issues" in order to "make sure that [the media] understood and correctly conveyed to the public the information contained in the audit reports" Plaintiff's Response at 3. Plaintiff notes that in *Garcetti* the parties agreed that Ceballos wrote the memo pursuant to his job duties, but that no such stipulation exists here. Consequently, Plaintiff argues that "there is serious room for debate as to the scope of [his] official duties," whereas this was not so in *Garcetti*. *Id.* at 2, *citing Garcetti*, 126 S. Ct. at 1961. Plaintiff cites deposition testimony of commissioner Lyn Banks, who stated that it was the duty of commissioner Beard, chair of the audit committee, to speak to the media.

Defendants argue that "[u]ntil now, Plaintiff's position has been that [interacting with the media and law enforcement was] carried out as part of his official job duties and responsibilities as Auditor General." Defendants' Reply at 1. Defendants point to the following portions of plaintiff's deposition testimony:

> Q: When you've told us about going to the FBI and going to the prosecuting attorney, did you believe that when you went to either the FBI or the prosecuting attorney or any other law enforcement agency that that was part of your responsibilities and duties as Auditor General?
>
> A: Yes.
>
> . . . .
>
> Q: As part of your job description as Auditor General, did that include you interacting with the media?
>
> A: Absolutely.
>
> Q: Okay. That was a specific job duty that you had?
>
> A: Yeah, responsibility. You have the – the yellow book standards that say there's a duty to make sure that information is conveyed correctly, and absolutely there's a responsibility that this information, the reports, be made available to the public for review and you have a responsibility to make sure that the information that

> they received is understood, and that's in the standards you gave me yesterday.
>
> Q: My question is whether it was your job responsibility to interact with the media as opposed to a responsibility of the clerk's office or somebody else within the Commission or county government.
>
> A: I can only – for five years it was my responsibility, and for seven, for the seven years I was Auditor General it was my responsibility. When Jewel Ware became Chair she tried to stifle that process. She had a discussion with Mr. Johnson and Mr. Johnson had a discussion with me that Jewel Ware wanted nobody to speak to the media.
>
> Mr. Johnson informed me that he told her that was not a good policy to instruct directors not to be able to talk to the media; so yes, it was part of my job duties to talk to the media on matters of audit concerns and on accounting concerns.

*Id.* at 2 (*quoting* Dunleavy dep. at 234-236, 294).

Further, defendants note that Plaintiff indicated in his deposition testimony that reports he made to the media involved his job duties pursuant to Government Auditing Standard 8.05, which requires that audit results be made available for public inspection. Finally, defendants note that plaintiff testified he relied on the county's fraud investigation policy, which requires county employees to report fraud, when he reported to law enforcement. Defendants conclude that plaintiff previously acknowledged that he was acting pursuant to his official job duties when reporting to the media and law enforcement, and that he has changed his position on this issue only since *Garcetti* made clear that his earlier position was fatal to his case.

On this record, the court concludes that when plaintiff interacted with the media and law enforcement concerning potential government misconduct, he did so as part of his official duties as the county auditor. Plaintiff clearly acknowledged as much in his unequivocal deposition testimony, and it was not until after the court issued its show cause order that plaintiff suddenly changed his position on this issue.

7

Plaintiff now attempts to downplay his deposition testimony. Plaintiff indicates that he also testified that interacting with the media and law enforcement are not mentioned in his job description. However, while Plaintiff's job duties may not have explicitly required him to talk to the media and law enforcement, both parties agree that they did require him to make his audit reports available to the public. Further, plaintiff indicated in his response that he spoke to the media because "[s]ome of these things [in the audit reports] were very technical issues that [the media] needed to understand what we were saying and that's the reason why I would even discuss a report with [the media]." Plaintiff's Response at 4. Thus, plaintiff acknowledges that explaining technical issues to the media went hand-in-hand with his express duty to make his audit reports available to the public. The requirement that an auditor make his findings available to the public would be meaningless if the auditor had no responsibility to ensure that the public understands the audits. As plaintiff testified at his deposition, "absolutely there's a responsibility that . . . the reports . . . be made available to the public for review *and you have a responsibility to make sure that the information . . . is understood*." Dunleavy Dep. at 234-236, 294 (emphasis added).

Further, the *Garcetti* Court stated that "[t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." 126 S. Ct. at 1962. Thus, the written job description is not as telling as plaintiff's own description, under oath, of what he was actually required to do as county auditor. Plaintiff testified that discussing his findings with the media and with law enforcement "absolutely" was part of his job duties, and this ends the inquiry on this subject.

8

The court concludes that plaintiff interacted with the media and law enforcement pursuant to his official job duties. This speech, which is the basis of the claimed retaliation, is therefore not afforded First Amendment protection. Pursuant to *Garcetti*, plaintiff's First Amendment claim must be dismissed. As this is plaintiff's only remaining federal claim, dismissal of the remaining state law claims for lack of subject matter jurisdiction is warranted as well. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999); *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir. 1997). Accordingly,

IT IS ORDERED that plaintiff's First Amendment claim (Count I) is dismissed pursuant to *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006).

IT IS FURTHER ORDERED that plaintiff's remaining state law claims (Counts IV and VIII) are dismissed for lack of subject matter jurisdiction.

                                                          ____s/Bernard A. Friedman_____  
Dated: August 16, 2006                      BERNARD A. FRIEDMAN  
     Detroit, Michigan                CHIEF UNITED STATES DISTRICT JUDGE

**I hereby certify that a copy of the foregoing document was served this date upon counsel of record electronically and/or via first-class mail.**

      **/s/ Patricia Foster Hommel**_____  
        **Patricia Foster Hommel**  
   **Secretary to Chief Judge Friedman**

9